# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CORNICE & ROSE )
INTERNATIONAL, LLC, )
            )    No. 21 C 6112
         *Plaintiff*, )
   v.          )    Judge Virginia M. Kendall
            )
ACUITY, A MUTUAL )
INSURANCE COMPANY, )
            )
         *Defendant*. )
            )
            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Cornice & Rose International, LLC ("Cornice") filed this suit against Defendant Acuity, a Mutual Insurance Company ("Acuity") alleging breach of contract (Count I), seeking a declaratory judgment that Acuity has a duty to defend and a duty to indemnify Cornice related to an underlying counterclaim (Count II), and seeking costs under Section 5/155 of the Illinois Insurance Code for Acuity's failure to provide coverage (Count III). (Dkt. 1). Acuity moves for a judgment on the pleadings on all three counts. (Dkt. 10). Cornice moves for partial judgment on the pleadings on Count II. (Dkt. 18). For the reasons set out below, the Court grants Acuity's motion for judgment on the pleadings [Dkt.10] in full and denies Cornice's cross-motion for partial judgment on the pleadings [Dkt.18].

## BACKGROUND

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual

allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal

conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless

otherwise noted, the following factual allegations are taken from Plaintiff's original complaint

[Dkt. 1] and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*,

844 F.3d 670, 675 (7th Cir. 2016).

I.    **The Underlying Counterclaim**

On October 20, 2014, McQuillen Place Company, LLC ("MPC") entered into an agreement

with Cornice wherein Cornice would provide architectural services related to the design and

construction of a building known as "McQuillen Place" in Charles City, Iowa. (Dkt. 1-8 at 13).

In the Standard Form of Agreement between Owner and Architect, AIA Doc. B101-2007, Cornice

entered with MPC (the "Agreement"), Cornice agreed, among other things, to provide the

following services:

1.    Schematic design phase services and design development phase services which
generally include preparing building plans and architectural drawings (§§ 3.2–3.3
of the Agreement);

2.    Construction documents phase services which include preparing architectural, civil,
structural, mechanical, electrical, plumbing, fire protection, and landscape
documents for permitting, and providing such other services necessary to obtain
approval of the construction documents by appropriate governmental agencies (§
3.4 of the Agreement);

3.    Construction phase services and evaluations of the work which include providing
administration of the contract between the owner and the construction manager and
evaluation of the McQuillen Place project at regular intervals to become "familiar
with the progress and quality of the portion of the Work completed, to endeavor to
guard the Owner against the defects and deficiencies in the Work." However, under
the Agreement, Cornice has no "control over, charge of, or responsibility for the
construction means, methods, techniques, sequences or procedures . . . nor shall
[Cornice] be responsible for the Construction Manager's failure to perform the
Work in accordance with the requirements of the Contract Documents. [Cornice]
shall be responsible for [Cornice's] negligent acts or omissions, but shall not have
control over or charge of, and shall not be responsible for, acts or omissions of the
Construction Manager or of any other persons or entities performing portions of the

2

Work." (§ 3.6 of the Agreement).

(*Id.* at 16-20). First Security Bank & Trust ("FSBT") provided mortgage financing for the McQuillen Place building and then purchased any causes of action held by MPC from its Bankruptcy Trustee. (Dkt. 1 ¶ 15). Four Keys, LLC ("Four Keys") ultimately purchased the McQuillen Place building on April 24, 2020. (Dkt. 1 ¶ 16).

Four Keys and FSBT filed a counterclaim (the "Underlying Counterclaim") against Cornice on September 2, 2021, in the United States District Court for the Northern District of Iowa, Case No. 6:20-cv-2097. (Dkt. 1 ¶ 12; Dkt. 1-8). In the Underlying Counterclaim, Four Keys and FSBT alleged that after possession of the McQuillen Place building, the parties "discovered information of defective, incomplete and architectural problems with the building. The Underlying Counterclaim alleges "the building was not suitable for occupancy and use without a substantial investment in the repair and completion of the work" and "Four Keys and FSBT suffered damages of payments to third-parties, including but not limited to Dean Snyder Construction, to repair, complete, modify and bring the project to the applicable standards and make it ready for occupancy." (Dkt. 1 ¶¶ 21–22; Dkt. 1-8 at 5, 7). Four Keys and FSBT seek recovery for the damage suffered when Cornice allegedly breached its standard of care and delivered a building that did not meet the codes, standards, and other rules and regulations, and needed substantial repairs. (Dkt. 1-8 at 10). The Underlying Counterclaim alleges four causes of action: Count I, professional malpractice, Count II, equitable indemnity, Count III, breach of contract, and Count IV, negligence. (Dkt. 1-8).

## II. The Acuity Policies

Acuity issued a Commercial General Liability Insurance policy to Cornice on or about December 4, 2013. (Dkt. 1 ¶ 7). The policy covered December 4, 2013 through December 4,

3

2014, and Acuity subsequently issued annual renewal policies to Cornice for the periods covering December 4, 2014 through December 4, 2020.  (*Id.*; Dkt. 1-1 to 1-7).

The Acuity Policies state Acuity "will pay those sums that the insured becomes legally obligated to pay as damages because of *bodily injury* or *property damage* to which this insurance applies. We will have the right and duty to defend the insured against any *suit* seeking those damages…."  (Dkt. 1 ¶ 8).  The insurance applies to "bodily injury" or "property damage" only if: "(1) The *bodily injury* or *property damage* is caused by an *occurrence* that takes place in the *coverage territory*; (2) The *bodily injury* or *property damage* occurs during the policy period." (*Id.*).  The Acuity Policies define "occurrence" and "property damage" as follows:

1) "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."; and
2) "Property damage" means: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it."

(Dkt. 1-1 at 76–77; Dkt. 1-2 at 84–85; Dkt. 1-3 at 82–83; Dkt. 1-4 at 84–85; Dkt. 1-5 at 87–88; Dkt. 1-6 at 93–94; Dkt. 1-7 at 92–93).  The Acuity Policies contain no exclusion barring coverage for property damage arising out of professional services.  (Dkt. 1 ¶ 11).

Cornice notified Acuity of the Underlying Counterclaim in accordance with the terms and conditions of the Acuity Policies on or about October 7, 2021.  (*Id.* at ¶ 24).  On October 12, 2021, Acuity provided Cornice with a letter disclaiming any duty to defend or indemnify Cornice in the Underlying Counterclaim, citing as basis that "the Counterclaim does not involve an 'occurrence' resulting in 'property damage' that is not otherwise subject to a policy exclusion."  (*Id.* at ¶¶ 25–26; Dkt. 1-9).  In response, Cornice filed this lawsuit on November 16, 2021, alleging breach of contract (Count I), seeking a declaratory judgment that Acuity has a duty to defend and a duty to

4

indemnify Cornice related to an underlying counterclaim (Count II), and seeking costs under Section 5/155 of the Illinois Insurance Code (Count III) for Acuity's failure to provide coverage. (Dkt. 1).[1]

## LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams*, 742 F.3d at 727–28. The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same. *Federated Mutual Ins. Co. v. Coyle Mechanical Supply Inc.*, 983 F. 3d 307, 313 (7th Cir. 2020). "When a plaintiff moves for judgment on the pleadings, the motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020). In order to succeed, "the moving party must demonstrate that there are no material issues of fact to be resolved." *Coyle Mechanical Supply Inc.*, 983 F.3d at 313 (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998)). As with a motion to dismiss, the Court must determine whether the complaint states a claim to relief that is plausible on its face, drawing all reasonable inferences in the plaintiff's favor. *Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017) (citations omitted).

## DISCUSSION

### I.  Acuity Has No Duty to Defend

---

[1] Cornice in its cross-motion for partial judgment on the pleadings urges the Court to deem specific allegations in the operative complaint admitted because Acuity's responses are inadequate under Rule 8 of the Federal Rules of Civil Procedure. (Dkt. 13 at 7). Given the Court's ruling on the dispositive issue of duty to defend, the question concerning the sufficiency of Acuity's Answer (Dkt. 9) under Rule 8 is moot.

Under Illinois law, the Court compares the language in the insurance policy with the allegations in the underlying complaint to determine whether an insurer has a duty to defend. *Lagestee–Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012) (citing *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods, Co.*, 215 Ill.2d 146, 154–55 (Ill. App. Ct. 2005)). "If the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent." *Id.* The duty to defend is broad enough to include claims that fall within or potentially within coverage, so it must be clear from the face of the underlying complaint that the stated facts do not fall within the policy's coverage. *Id.*

Under the Acuity Policies, coverage exists for bodily injury or property damage caused by an "occurrence" during the policy period. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Acuity Policies do not define the term "accident." However, "accident" is defined under Illinois law as "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Stoneridge Dev. Co. v. Essex Ins. Co.*, 382 Ill.App.3d 731, 749 (Ill. App. Ct. 2008) (quoting *Westfield Nat'l Ins. Co. v. Continental Community Bank & Trust Co.*, 346 Ill.App.3d 113, 117 (Ill. App. Ct. 2003)). Whether Acuity owes Cornice a duty to defend depends on whether the Underlying Counterclaim alleges "property damage" caused by an "occurrence," and whether a particular policy exclusion excuses coverage. Neither party alleges that an exclusion to the policy applies, and therefore the Court focuses its analysis on whether the Underlying Counterclaim alleges an "occurrence" and "property damage."

Damage to a construction project resulting from faulty workmanship is not an "accident"

nor an "occurrence," rather, it represents "the natural and ordinary consequence of faulty construction." *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 689 (7th Cir. 2008). As one court reasoned, "[a] CGL policy does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." *Pekin Ins. Co. v. Richard Marker Assocs., Inc.*, 289 Ill.App.3d 819, 823 (Ill. App. Ct. 1997) (internal quotations omitted). Under Illinois law, for faulty workmanship to qualify as an "occurrence," it must damage something other than the project itself. *See Monticello Ins. Co. v. Wil–Freds Const., Inc.*, 277 Ill.App.3d 697, 704 (Ill. App. Ct. 1996).

In *Wil-Freds Const., Inc.*, the court observed, "[If the underlying complaint alleges] water damage suffered by cars in the parking garage, or a pedestrian sued [the insured] for an injury caused by falling concrete, there can be little doubt that [the insurer] would be required to defend [the insured] under the CGL policy, because there would have been negligent manufacture that results in 'an occurrence.'" 277 Ill.App.3d at 705–06 (internal quotations omitted). Along the same lines, the court in *Pekin Insurance* found an "occurrence" when uninsulated pipes froze and burst, damaging furniture, clothing, and antiques, since the damaged items were not part of the project itself. 289 Ill.App.3d at 823. Conversely, if the claim is alleging property damage to only the project itself, courts are faced merely with "'an occurrence' of alleged negligent manufacture." *Id.* at 705.

Cornice argues unsuccessfully that faulty workmanship can give rise to an "occurrence" under multiple theories. First, Cornice argues that if the person performing the work did not intend nor expect the result, "the result was the product of an accident." *Country Mut. Ins. Co. v. Carr*, 372 Ill.App.3d 335, 341 (Ill. App. Ct. 2007). Cornice points to *Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co.*, wherein the Seventh Circuit found that the negligence of an architect, who was also responsible as "inspector and certifier" of a building, did constitute an "occurrence"

since the underlying complaint did not allege the architect "intentionally overlooked [the constructor's] shortcoming or that it expected to miss them or to certify payments that were not due." 126 F.3d 886, 891 (7th Cir. 1997).

However, courts have since reiterated the importance of an "occurrence" damaging something other than the structure, declining to extend the test of intentionality. The Seventh Circuit in *Nautilus Ins. Co. v. Bd. of Directors of Regal Lofts Condo. Ass'n*, for example, held:

> Illinois courts require that for an incident to constitute an "occurrence" or "accident" in the building construction context, "there must be damage to something other than the structure, *i.e.,* the building, in order for coverage to exist." . . . "[T]he natural and ordinary consequences of defective workmanship . . . d[o] not constitute an 'occurrence.'" . . . [The insurer] points out, and the [insured] does not seriously dispute, that the allegations . . . in the underlying action involved only damage to the building itself, nothing more. Damage of this nature is clearly not an "occurrence" under Illinois law.

764 F.3d 726, 732 (7th Cir. 2014); *see also Stoneridge Dev. Co.*, 382 Ill.App.3d at 751 ("[W]e believe that, even if the person performing the act did not intend or expect the result, if the result is the 'rational and probable' consequence of the act or, stated differently, the 'natural and ordinary' consequence of the act, it is not an 'accident.'") (internal citations omitted). The Seventh Circuit reenforced the holding of *Stoneridge* which explicitly rejected the reasoning of *Carr*, noting, "*Carr* appears to be an outlier, and it was roundly criticized in *Stoneridge*." *Id* at 732 f.n. 1.

The Underlying Counterclaim also fails to allege "property damage." "'[W]here the underlying complaint alleges only damages in the nature of repair and replacement of the defective product or construction, such damages constitute economic losses and do not constitute 'property damage.'" *Viking Const. Mgmt., Inc.*, 358 Ill.App.3d at 54-55. When the underlying complaint claims damage to the building beyond the insured's own work and product, "property damage" is alleged. *Westfield Insurance Company v. National Decorating Service, Inc.*, 863 F.3d 690 (7th

8

Cir. 2017). Plaintiff points to *National Decorating* for the premise that "[u]nder Illinois law, negligently performed work or defective work can give rise to an 'occurrence' under a CGL Policy . . . [where] the policy defines an 'occurrence' to include not only an accident, but also 'continuous or repeated exposure to conditions.'" *Id*. at 697. In *National Decorating*, a building developer hired National Decorating, a subcontractor, to paint the exterior of the building with a protective waterproof sealant. *Id.* at 692. A coverage dispute ensued over water damage to the entire building caused by an insufficient amount of paint. *Id.*

Since the underlying complaint alleged damage to portions of the building other than the exterior, the court found sufficient allegations of "property damage." *Id.* at 697-98. The court observed, "The underlying complaint seeks to recover for damages incurred to other portions of the building, not just the exterior, which was allegedly coated with an insufficient amount of paint. It would be illogical to conclude that the scope of the project for which National Decorating contracted was the entire 200 North Building." *Id.* Such circumstances differ from those that apply to a general contractor of developer. *See Acuity Ins. Co. v. 950 West Huron Condo. Assoc.*, 138 N.E.3d 189, 199 (Ill. App. Ct. 2019) ("[W]hen an underlying complaint alleges that a subcontractor's negligence caused something to occur to a part of the construction project outside of the subcontractor's scope of work, this alleges an occurrence under this CGL policy language, notwithstanding that it would not be an occurrence from a general contractor or developer's perspective.").

The Underlying Counterclaim here, in contrast, alleges damages to repair and replace faulty workmanship. Such damages under Illinois law constitute economic losses and not "property damage." Unlike *National Decorating*, responsible only for painting the exterior of the building, Cornice contracted to perform an extensive suite of services under the Agreement.

Cornice's responsibilities under the Agreement included design; construction documentation; administration of the contract between the owner and the construction manager; and evaluation of the McQuillen Place project at regular intervals to become "familiar with the progress and quality of the portions of the work completed, to endeavor to guard the owner against the defects and deficiencies in the Work." (Dkt. 1-8).

The Underlying Counterclaim alleges nineteen specific issues with McQuillen Place. Seventeen of the nineteen relate to problems that could have arisen from Cornice's direct actions. For example, the Underlying Counterclaim states the kitchen cabinets were too tall and blocked access to the windows; the toilets in some spaces were placed within one foot of the windows; elevator did not meet code; and drywall workmanship was unacceptable. Cornice argues such defects relate to improper construction and not architectural design, and under the Agreement, Cornice is not responsible for the acts and omissions of other tradespeople. (Dkt. 13 at 10). Cornice agreed to evaluate the completed work and to protect the owner against defects and deficiencies in the completed work. These seventeen specific issues noted in the Underlying Counterclaim are a direct result of Cornice's own workmanship. The underlying claim is one for a breach of contract alleging property damage exclusively to the project itself.

Cornice states the following two factual allegations claim damage to something other than the project itself: (1) "[T]he attic space had no ventilation and no vapor barrier installed causing the plywood roof sheathing and trusses to suffer rot"; and (2) "a 'torpedo heater' without ventilation was used by [Cornice] that created an open flame hazard and left a residue on many surfaces." (Dkt. 1-8 at 3–5). As illustrated by the examples above, these remain allegations of damage to the project itself. Cornice does not allege that defective ventilation caused damage to property unattached to the building such as furniture etc. "Illinois courts have drawn a line

between 'costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses,' . . . and costs that arise 'when an insured causes damage to things other than its own work or product.' . . . Only the latter type of costs tends to arise from 'property damage' caused by an 'occurrence.'" *Coyle Mechanical Supply Inc.*, 983 F.3d at 317 (internal citations omitted). The Underlying Counterclaim in this case only brings claims for costs with replacing Cornice's alleged defective work product and therefore does not allege an "occurrence" nor "property damage" under Illinois law.

## II. The Illinois Estoppel Doctrine Does Not Apply, and Acuity Has No Duty to Indemnify

The application of the Illinois estoppel doctrine is inappropriate in this case. In Illinois, "[t]he general rule of estoppel provides that an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 150 (Ill. 1999). Instead, an insurer must provide a defense to the insured under a reservation of rights or seek a declaratory judgment that there is no coverage. *Id.* at 151. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage. *Id.* However, "[a]pplication of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered. These circumstances include where the insurer was given no opportunity to defend; where there was no insurance policy in existence; and where, when the policy and the complaint are compared, there clearly was no coverage or potential for coverage." *Id.*; *see also Ismie Mut. Ins. Co. v. Michaelis Jackson & Assocs., LLC*, 397 Ill.App.3d 964, 974 (Ill. App. Ct. 2009) ("Estoppel cannot be utilized in order to create coverage if none existed otherwise.").

11

The Illinois estoppel doctrine does not apply in this case. Cornice argues that Acuity is estopped from disclaiming its duty to indemnify because it failed to defend the Underlying Counterclaim under a reservation of rights or seek a declaratory judgment. However, in this case, the estoppel doctrine is inappropriate. A comparison of the Acuity Policies with Underlying Counterclaim demonstrates no coverage or potential for coverage, and the Court cannot apply estoppel doctrine in a manner to create coverage. Since Acuity has no duty to defend or indemnify Cornice in the Underlying Counterclaim, the Court grants Acuity's motion for judgment on the pleadings on Counts I and II, and denies Cornice's motion for partial judgment on the pleadings.

## III.   Section 155 of the Illinois Insurance Code

The operative compliant fails to allege facts to demonstrate Cornice is entitled to an award of costs under Section 155 of the Illinois Insurance Code. Cornice requests statutory penalty under Section 155 because "even a cursory examination"' of the Seventh Circuit's case law should have revealed to Acuity that it had a duty to defend under Illinois law. (Dkt. 1 ¶ 46). Section 155 of the Illinois Insurance Code provides that:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs . . .

215 ILCS 5/155. An insurer's conduct is not "vexatious and unreasonable" if: "(1) there is a bona fide dispute concerning the scope and application of the insurance coverage. . . (2) the insurer asserts a legitimate policy defense . . . (3) the claim presents a genuine legal or factual issue regarding coverage . . . or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir.2000). If there is a bona fide coverage dispute that is "[r]eal, genuine, and not feigned," statutory sanctions are inappropriate. *Medical Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir.2007).

12

Cornice has failed to allege any facts that could show Acuity acted vexatiously or unreasonably in denying coverage. Accordingly, the Court grants Acuity's motion for judgment on the pleadings on Count III.

## **CONCLUSION**

For the reasons discussed, the Court grants Acuity's motion for judgment on the pleadings on all three counts [10] and denies Cornice's cross-motion for partial judgment on the pleadings [18]. Acuity has no duty to defend since the Underlying Counterclaim fails to allege "property damage" caused by an "occurrence." The Illinois estoppel doctrine does not apply to this case, and the operative compliant fails to state facts that support the claim for costs under Section 155 of the Illinois Insurance Code.

Virginia M. Kendall
United States District Judge

Date: September 27, 2022